IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 9, 2022 Session

## STATE OF TENNESSEE v. DOUGLAS MAC RICHMOND

**Appeal from the Criminal Court for Sumner County**
**No. 400-2019          Dee David Gay, Judge**
_____

### No. M2021-01025-CCA-R3-CD
_____

The Defendant, Douglas Mac Richmond, pled guilty in the Sumner County Criminal Court to nine counts of sexual exploitation of a minor by electronic means, a Class B felony. Pursuant to the plea agreement, he received an effective sixteen-year sentence as a Range I, standard offender with the trial court to determine the manner of service of the sentence. After a sentencing hearing, the trial court ordered that he serve the sentence in confinement. On appeal, the Defendant claims that he was denied due process at sentencing because the trial court allowed unreliable hearsay testimony, "infused" the court's religious beliefs into the court's sentencing decision, failed to consider required statistical information from the Administrative Office of the Courts ("AOC"), and considered information outside the Defendant's actual criminal conduct. The Defendant also claims that we should review the trial court's sentencing decision de novo because the court did not follow the purposes and principles of sentencing and that we should grant his request for full probation or split confinement. Based on the oral arguments, the record, and the parties' briefs, we conclude that the Defendant has not shown a violation of due process by the trial court but that a de novo review of the denial of alternative sentencing is warranted. Upon our de novo review, we conclude that the trial court properly ordered that the Defendant serve his effective sixteen-year sentence in confinement.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., AND JILL BARTEE AYERS, JJ., joined.

Ellison Berryhill (on appeal), David A. Doyle (on appeal and at sentencing), and Lawren B. Lassiter and Randy P. Lucas (at plea hearing), Gallatin, Tennessee, for the appellant, Douglas Mac Richmond.

Herbert H. Slatery III, Attorney General and Reporter; T. Austin Watkins, Senior Assistant Attorney General; Lawrence Ray Whitley, District Attorney General; and Jenni Smith and

Thomas Boone Dean, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

In April 2019, the Sumner County Grand Jury returned a nineteen-count indictment, charging the Defendant in counts one through nine with sexual exploitation of a minor by electronic means in violation of Tennessee Code Annotated section 39-13-529(a); in counts ten through fifteen with sexual exploitation of a minor by electronic means in violation of Tennessee Code Annotated section 39-13-529(b)(2); and in counts sixteen through nineteen with sexual battery by an authority figure in violation of Tennessee Code Annotated section 39-13-527. All of the counts involved the same female victim.

On May 21, 2021, the Defendant pled guilty to counts one through nine, sexual exploitation of a minor by electronic means in violation of Tennessee Code Annotated section 39-13-529(a).[1] Pursuant to the plea agreement, he was to receive an eight-year sentence for each conviction as a Range I, standard offender with counts one and two to be served consecutively and the remaining counts to be served concurrently with count one for a total effective sentence of sixteen years. The trial court was to determine the manner of service of the sentence.

At the guilty plea hearing, the State gave the following factual account of the crimes: In the fall of 2018, the victim was a fourteen-year-old student at Gallatin High School, and the Defendant was her thirty-five-year-old teacher. The victim began sending text messages to the Defendant, and they exchanged messages with their cellular telephones about "things like football games and normal activities." Within a week of starting to exchange messages, the Defendant told the victim to download the Kik application so they could communicate via Kik instead. The victim created a Kik account on October 20, 2018. The Defendant also had a Kik account and went by the name "'DMAC the Chemist.'" An investigator would have testified at trial that Kik was "a notorious text message application used by sex offenders."

---

[1] Tennessee Code Annotated section 39-13-529(a) provides,

It is an offense for a person eighteen (18) years of age or older, by means of oral, written or electronic communication, electronic mail or internet service, including webcam communications, directly or through another, to intentionally command, hire, persuade, induce or cause a minor to engage in simulated sexual activity that is patently offensive or in sexual activity, where such simulated sexual activity or sexual activity is observed by that person or by another.

The victim and the Defendant began exchanging messages on Kik. Although the victim and the Defendant deleted most of the messages from their telephones, the Gallatin Police Department ("GPD") later was able to obtain many of the messages for the time period of November 2, 2018, to February 5, 2019, which was the date of the Defendant's arrest. The messages showed that immediately after the victim downloaded the Kik application, the Defendant began asking her for nude photographs of herself. The victim was scared to send him nude photographs but began sending him "normal face shots and clothed photographs." The Defendant continued to ask the victim for nude photographs, so the victim began sending him partially-nude photographs. Eventually, she began sending him fully-nude photographs.

The Defendant coached the victim on how to take sexually explicit photographs and asked for photographs almost daily. Toward the end of their relationship, the Defendant often asked the victim to meet him in his classroom closet after school and during breaks to engage in sexual activity. However, the victim always "'chickened out'" and made excuses as to why she could not meet him. The Defendant then would send messages to the victim in which he told her that she "'owed him,'" meaning that she owed him more photographs because she would not meet him in the closet. The Defendant's messages also became "very sexual and graphic describing the sexual things he wanted to do to the victim in his classroom closet," and the victim had to ask the Defendant several times for clarification about the meaning of certain sexual phrases. The Defendant sent at least nine photographs of his fully erect penis to the victim, and some of those photographs were taken inside his classroom. He also sent the victim a video of himself masturbating in what appeared to be Gallatin High School's training facility. The Defendant told the victim numerous times that he could go to jail for his behavior and told her to delete their messages and not to tell anyone about their contact. Ultimately, another student found out about the relationship and disclosed it to the school administration, which resulted in the Defendant's arrest.

After the State's recitation of the facts, the trial court accepted the Defendant's guilty pleas and scheduled a sentencing hearing to determine the manner of service of the effective sixteen-year sentence. The trial court allowed the Defendant to remain on bond pending sentencing but ordered that he not have any direct or indirect contact with the victim, that he register as a sex offender, and that he undergo a psychosexual risk assessment. The State dismissed the remaining charges.

The trial court held a sentencing hearing on July 30, 2021. At the outset of the hearing, defense counsel recognized that the Defendant was not considered to be a favorable candidate for alternative sentencing because the crimes were Class B felonies. However, defense counsel asserted that "despite [the Defendant's] three months of atrociousness and the damage that he did to this child," the trial court should suspend the effective sixteen-year sentence to probation.

Katie Hope[2] testified for the State that in February 2019, she was an investigator with the GPD. On February 5, she responded to a call at Gallatin High School regarding a juvenile female student possibly involved in a relationship with a teacher. The teacher was the Defendant, who was married and had a nine-month-old baby. Investigator Hope first interviewed the female student who had reported the relationship. Investigator Hope then interviewed the victim. The victim disclosed to Investigator Hope that she and the Defendant had been "'sexting' for some time" and had exchanged nude photographs and videos. Initially, the victim and the Defendant communicated via normal cellular telephone text messages. However, "within a matter of days," they began communicating via the Kik application. Investigator Hope explained about Kik as follows:

> Kik is known in the criminal realm as -- the company is not based in the United States and therefore they do not honor our judicial process. So these messages can be deleted, usually not recovered. It is known as an app where child pornography, grooming of children, things like that is utilized as they know it would be difficult to prosecute.

The Defendant had downloaded the Kik application in 2015. Investigator Hope took possession of the victim's telephone, but the victim had deleted their messages.

Investigator Hope testified that after she interviewed the victim, she interviewed the Defendant. He denied knowing the victim but admitted sending text messages to other students. He told Investigator Hope that his cellular telephone number was in his class syllabus in case his students needed to contact him for help with their homework. The Defendant also was the school baseball coach and had been in contact with student athletes. Eventually, the Defendant admitted knowing the victim and told Investigator Hope that "some students had made him aware that [the victim] had a crush on him." Investigator Hope asked the Defendant if he sent messages to the victim, and the Defendant "hinted that maybe someone was impersonating him, maybe someone was out to get him, maybe some of his social media had been hacked, things like that."

Investigator Hope testified that the Defendant claimed he had "no idea" where his cellular telephone was located. By the end of the interview, though, he disclosed the "likely location" of his telephone. Someone retrieved the telephone and brought it to Investigator Hope. At some point during the Defendant's interview, he became "more truthful" about his contact with the victim and admitted that he and the victim had exchanged messages via Kik.

Investigator Hope testified that the Defendant was transported to the police department and that he was placed in a room by himself. Investigator Hope allowed him

[2] At the time of the sentencing hearing, the witness's last name had changed to Kittrell. For consistency and clarity, we will refer to her as Investigator Hope.

- 4 -

to telephone his wife, and their conversation was recorded. The Defendant told his wife that he and the victim had been sending photographs to each other but that they did not have a sexual relationship. He also told his wife that he was addicted to pornography and that he had been watching pornography and masturbating to it every morning before school.

Investigator Hope testified that although the victim had deleted the Kik messages from her telephone, the GPD was able to recover most of the messages. Investigator Hope said that the messages began as "very innocent from the victim's end" and that the victim "really had no sexual experience, knowledge." The victim sent "Snapchat selfies with bunny ears" to the Defendant and told him about some family issues she was having, but the Defendant constantly asked her for nude photographs and did not show any concern about her personal problems. The victim began sending him photographs of herself fully clothed. The Defendant "push[ed]" her to "show more skin," so her photographs progressed "from fully clothed to bikini to then nude." The Defendant also "coach[ed] her on what positions to place herself in." Investigator Hope acknowledged that the Defendant told the victim to "lay down and open [her] vagina" and to bend over and spread her "butt [cheeks]." The victim did not know what "oral sex" meant, so the Defendant had to explain it to her. Investigator Hope said that the Defendant's messages became "more vulgar" over time and that "it was apparent that the victim was learning how to speak more sexually suggestive and how to pose herself, and by the end of it she was just as much wrapped up in it as he was." The Defendant frequently reminded the victim to delete their messages, and he repeatedly told her that he could go to prison.

Investigator Hope testified that the Defendant kept asking the victim to have sex with him in his classroom closet. The victim "would somewhat seem like she was interested" but always made an excuse at the last minute as to why she could not meet him. Consequently, the Defendant would tell the victim that she "owed him more photos as payback for leaving him hanging." The Defendant began sending the victim photographs of his erect penis covered by his boxer shorts but then began sending her photographs of his erect penis exposed. Some of the photographs appeared to have been taken in the Defendant's classroom and at the school's baseball facility. The Defendant also sent the victim one video of himself masturbating "possibly in the baseball practice facility."

Investigator Hope testified that she conducted a forensic interview with the victim and that the victim "discussed some potential sexual batteries" that had occurred in the Defendant's class. Specifically, the victim told Investigator Hope that the Defendant "would brush up against her, touch her in her thigh, grab her breasts." He also grabbed her buttocks one time. The Defendant later mentioned the touches in his messages to the victim, so the police were able to "match up each of those incidents."

On cross-examination, Investigator Hope testified that the female student who had reported the relationship was "under the impression" that the victim and the Defendant

"had had oral sex . . . and that they were sexting." The victim had told the student that the victim had engaged in fellatio with the Defendant. But when Investigator Hope interviewed the victim, the victim was "adamant" that she and the Defendant did not engage in oral sex. At that time, Investigator Hope did not know if the victim was telling her the truth. However, Investigator Hope never found any evidence that the victim and the Defendant engaged in oral sex or sexual intercourse. Additionally, the "thousands" of Kik messages recovered from the victim's telephone showed she was being truthful. On redirect examination, Investigator Hope testified that although the victim and the Defendant did not have sexual intercourse, "I believe they absolutely would have had sex had [the victim] showed up in that closet."

The victim, who was seventeen years old at the time of the sentencing hearing, testified that the Defendant used to be her physical science teacher. He provided his students with his cellular telephone number at the beginning of the school year, and he and the victim began exchanging text messages in October 2018. At first, their messages were "[j]ust regular, everyday conversations." Three or four days later, though, the Defendant asked the victim to move their conversations to the Kik application, and she did so. The victim said that almost immediately, the Defendant's demeanor changed. The victim knew he wanted nude photographs of her, so she started sending him partially-nude photographs. Eventually, she began sending him fully-nude photographs because she respected him and "wanted to keep him happy." The Defendant began sending photographs of his erect penis to the victim, and he took some of the photographs in his classroom. He also sent her photographs of himself masturbating and tried to get her to have sex with him in his classroom closet, which had a locked door. The victim always made excuses as to why she could not meet him in the closet, and the Defendant would tell her that she had to send him photographs or videos of herself to "repay" him.

The victim acknowledged that she told another student that she and the Defendant had oral sex. The victim testified that she and the Defendant never had oral sex and that she lied to the student because the Defendant "was a very well-liked teacher. He was everybody's favorite, and I thought I was special, having what I thought was a relationship with him." When the school administration found out about the relationship, the victim tried to delete all of their communications from her telephone because she "didn't want to be in trouble" and "didn't want anything bad to happen to him." The victim thought she was in love the Defendant but later realized he had "manipulated" her and had "used" her.

The victim testified about incidents in which the Defendant touched her while she was in his class. One time, the Defendant came up behind her, and she felt his erect penis against her back. Another time, the victim was standing on a chair, and the Defendant put his shoulder against her inner thigh. In another incident, the Defendant put his forearm against the victim's "butt" while she was sitting on a desk. In other incidents, the Defendant "kind of just brushed his hand against [her] left breast" and "grabbed [her] butt." Some of the messages recovered from the victim's telephone corresponded to the incidents.

The victim testified that after the messages were revealed, she "felt like it was all [her] fault" and thought she had ruined the Defendant's life. The victim said that she became "very disliked around here," that she was blamed and bullied, and that she could no longer attend Gallatin High School. The victim tried traditional therapy but attended only five sessions and began using horses as therapy. She said the Defendant should have to serve his effective sixteen-year sentence in confinement. Upon being questioned by the trial court, the victim said that her relationship with the Defendant caused her to become afraid of men and that his ongoing case had been "exhausting and stressful."

The victim's mother testified that in February 2019, she learned about the messages and photographs exchanged between the victim and the Defendant. The victim's mother was "immediately enraged" because she did not think she had to protect the victim from the victim's teachers. She knew the victim had a crush on the Defendant because "[a]ll the girls did," but she never thought anything like this would happen.

The victim's mother testified that the victim had liver cancer and was very sick in the eighth grade. The victim was excited about attending high school, played on the soccer team, and was a "straight A student." After the victim's relationship with the Defendant was revealed, the victim's mother took the victim out of school for a few days. Other students began talking about the victim and creating "memes" with photographs of the victim and the Defendant. The victim also started being bullied. She "completely removed herself from anything school-related or teenagers-her-age related," and her grades fell to "[b]arely making B's and C's." The victim ended up attending "virtual" school. The victim tried traditional therapy but found therapy with horses. The victim's mother said the Defendant should serve his effective sixteen-year sentence in prison.

On cross-examination, the victim's mother testified that victim had an iPhone. The victim's mother did not monitor the victim's use of the iPhone because the victim was a good student and "didn't give [her] reason to have to do that." The victim's mother did not know anything about Kik. She said that the victim was "a tough girl" and acknowledged that the victim had put the incident with the Defendant behind her.

Investigator Charles Cook of the GPD acknowledged that at the prosecutor's request, he conducted "some investigation" into this case. On May 10, 2021, Investigator Cook spoke with S.F., who was a female student of the Defendant at a South Carolina high school from 2011 to 2012. S.F. told Investigator Cook that the Defendant was "pursuing her during school, saying things to her like my wife's not around and I can see you." The Defendant told S.F. that he thought she was attractive, and he "tried to cause problems" between her and her boyfriend. The Defendant also told S.F. that he "wanted to be with her and would do whatever it'd take to do that." S.F. told Investigator Cook that when she did not do what the Defendant wanted, he became "more of a bully type and told her that she was a pathetic piece of [sh*t] and that she was a loser."

Investigator Cook testified that according to the Defendant's employment records, he taught at four different high schools in South Carolina and Georgia prior to teaching at Gallatin High School. Investigator Cook spoke with the Defendant's ex-wife, with whom the Defendant had a daughter. The Defendant's ex-wife told Investigator Cook that "a couple of times they had to leave in a hurry" and that she did not know why. [She also told Investigator Cook that the Defendant was unfaithful, and she "shared several letters of apology from him, from everything to drinking to inappropriate types of relationships." Investigator Cook read aloud excerpts from a fifteen-page letter written by the Defendant's ex-wife. In the letter, she said that she had known the Defendant since middle school, that they married in 2014, and that they divorced in 2020. She said that the Defendant "was willing to violate a child for his own personal pleasure," that their daughter was "in direct danger," and that the Defendant should never be allowed to be around children.

Investigator Cook testified that the Defendant had been living in Michigan since his guilty pleas. Although the Defendant was required to register as a sex offender, he had not registered in Tennessee or Michigan at the time of the sentencing hearing. Investigator Cook thought the Defendant's failure to register was a violation of the sex offender law. Investigator Cook received information that the Defendant had met a woman "on a dating app called Tinder." Investigator Cook noted that as a condition of his bond, the Defendant was not allowed to access the internet. Investigator Cook also received information that the Defendant was dating or engaged to the woman and that the woman had two daughters who were twelve and thirteen years old. The Defendant's ankle monitor showed that he spent "significant time" at the woman's home and that he was with her when she supposedly drove her daughters to their father's home in Ohio. Another condition of the Defendant's bond was that he not have any contact with minors. Investigator Cook stated that if the Defendant accessed the internet or was around the woman's daughters, he violated the conditions of his bond.

On cross-examination, Investigator Cook testified that he did not begin his investigation of this case until May 2021. He acknowledged that he was "brought in to chase down" witnesses and said that he was able to "call these people [to] see what they had to say." The Defendant's ex-wife divorced him immediately after the charges were brought against him and only maintained an amicable relationship with him for the sake of their daughter. Investigator Cook said that he did not have any direct proof the Defendant accessed the internet after the Defendant's guilty pleas and that he had not spoken with the Defendant.

Jason Fuller testified for the Defendant that he was from Brighton, Michigan, and that he was the associate pastor at Brighton Nazarene Church. He said that he had known the Defendant for two years and that they met when the Defendant began attending the church during the Covid-19 pandemic. Mr. Fuller learned the Defendant had a barbeque business, so Mr. Fuller "reached out" to see if the Defendant would partner with the church to provide meals to frontline workers. Mr. Fuller and the Defendant began talking about

Celebrate Recovery, which was a national, Christ-centered program at the church for people with addictions. Mr. Fuller was starting a "discipleship group" in which he was incorporating elements from Celebrate Recovery, and the Defendant joined the group. Initially, Mr. Fuller was "cautious" and "cynical" of the Defendant. He researched the Defendant on the internet and learned the Defendant's story, and he met with the Defendant weekly for about two years. At their first meeting, the Defendant was "upfront" about his past and was "broken," "scared," and "looking for healing."

Mr. Fuller testified that the Defendant met with the church's senior pastor. The Defendant was honest with the senior pastor, and Mr. Fuller and the senior pastor became involved in the Defendant's "barbecue ministry." Mr. Fuller said that he did not know anything about the Defendant at the time of the offenses but that he thought "[s]omething happened to [the Defendant] two or three years ago when he was in jail, when he was at rock bottom, when he was at the most impressible broken spot in his life." Mr. Fuller thought the Defendant had "an encounter with God." He said that he thought the Defendant's behavior in this case was "terrible and disgusting" but that the Defendant had earned his trust and respect and that he did not think the Defendant was the same person the Defendant was two or three years ago. Mr. Fuller stated that the Defendant had found a purpose and passion for the Defendant's life, that the Defendant wanted to honor God, and that he thought the Defendant's heart had "genuinely been transformed."

The Defendant gave a lengthy allocution. He apologized to the victim's family and said his life changed forever when he was "booked" into jail on February 5, 2019. At that time, the Defendant did not have any direction, faith, or hope. The next day, a Gallatin pastor visited him in jail. When the Defendant returned to his cell, he "dropped to [his] knees" and told God that he wanted to "do [God's] will for the rest of [his] life; nothing else mattered." The Defendant said that he gave his life to God and that he spent the next ten months in jail "getting to know God on a deep, personal level while blessing others." The Defendant used his teaching skills to help inmates learn to read and obtain their GEDs. When the Defendant was released from confinement, he started a deck-building company because there were no jobs for convicted felons. He also started a homeless barbecue ministry in downtown Detroit. During the Covid pandemic, the Defendant used his ministry to feed 5,000 people.

Addressing the trial court directly, the Defendant said that he was "a man of God" and that "I know there's people in this room right now that think this is a mockery to talk about this Lord and Savior that totally changed and revitalized who I am." Defendant noted that prior to moving to Tennessee, he taught special education students in Charleston, South Carolina; worked with "inner city" students in Atlanta, Georgia; and coached students who went on to have careers in the NBA, the NBA Europe, the NFL, and major league baseball. The Defendant stated that he had to start his decking company because no one would hire him and that he put "[e]very dime" he earned from his company into his homeless ministry. Defendant asserted that justice already had been served in this case, noting that he could

no longer coach; that he could no longer be around children, including his sister's children; that he could no longer see his daughter, even on bond; and that he would have to live with the fact that he harmed a minor for the rest of his life. In closing, the Defendant stated that he knew he had "done some awful things" to the victim and her family but requested that the trial court consider his accomplishments and "what I'm about now."

The State introduced into evidence the Defendant's presentence report, his psychosexual risk assessment, and the text messages and photographs recovered by the police. In the presentence report, the Defendant stated that he earned a bachelor's degree in chemistry from Albion College in Michigan in 2006, that he played football and baseball in college, and that he earned good grades. He said that he pursued a master's degree in educational psychology through the University of Alabama's online master's program but that he had to withdraw from the program due to his arrest in this case. The Defendant described his physical and mental health as "good" and said that he was participating in Celebrate Recovery for his addiction to pornography. The Defendant stated that he began consuming alcohol when he was twenty-one years old, that he consumed beer, and that his alcohol use caused issues in his marriage. He also stated that his alcohol use contributed to a one-month extramarital affair that occurred while he and his ex-wife were living in Nashville and that he stopped drinking alcohol in July 2017. The Defendant said in the report that he had a close relationship with his parents, that he was living with them in Michigan, and that he was in very serious romantic relationship with a woman who also resided in Michigan.

Regarding the Defendant's employment history, the presentence report showed that at the time of sentencing, he owned Mac Custom Build and Design, a construction business, and Mac Daddy's BBQ Ministry, a nonprofit corporation. The Defendant was a teacher at Gallatin High School from August 2017 until he was fired in February 2019, and he worked for two construction companies in 2020. Prior to teaching at Gallatin High School, the Defendant was a public school teacher in Charleston, South Carolina, from August 2009 to August 2012; in Atlanta, Georgia, from August 2012 to May 2015; and in Nashville from May 2015 to August 2017. The presentence report did not show any prior criminal record for the Defendant.

The Defendant's Strong-R assessment was attached to his presentence report and classified his overall risk level as low. The assessment concluded that he had low needs relevant to "Mental Health," "Education," "Alcohol/Drug Use," "Attitudes/Behaviors," "Employment," Aggression," and "Friends" and that he had moderate needs relevant to "Family" and "Residential."

In June 2021, a licensed psychologist examined the Defendant for a psychosexual risk assessment. According to the assessment, the Defendant told the examiner that he had been married twice: first to his high school sweetheart and then to the mother of his daughter. The Defendant said that he was unfaithful to his second wife but that he attended

counseling and stopped consuming alcohol after he confessed the affair to her. The examiner noted that although the Defendant claimed to have attended counseling for about nine months, he could not remember the name of the counselor so that the examiner could obtain the Defendant's counseling records. The Defendant told the examiner that he viewed pornography and used Kik to share "inappropriate images" with others during his second marriage. The Defendant also began using chatrooms to obtain nude photographs from females and would masturbate to the photographs.

In the section of the assessment for the Defendant's version of the crimes, he stated that he "pursued" the victim and that he wanted nude photographs of her "to get sexual gratification." Defendant suggested to the victim that they have "'alone time'" in the back room attached to his classroom. He said that by "alone time," he meant "a blow job." However, he denied having any sexual contact with the victim. In the section for the Defendant's psychosexual history, he told the examiner that he photographed his penis and sent the photographs to the victim and about forty adults. He stated he that received nude photographs from less than forty women and that he thought the victim was the only "underage" female to send him photographs. The Defendant said that he made a video of himself masturbating and that he sent the video to the victim and to ten women.

The psychosexual risk assessment showed that the examiner administered the Visual Assessment of Sexual Interest ("VASI") to the Defendant. For that test, the Defendant was shown collages of images that depicted both sexes in all five Tanner Scales of sexual development, and his visual fixation responses were measured to identify the presence or absence of sexual interest. During the test, the Defendant "demonstrated a significant amount of time avoiding looking at images," and the examiner noted that "his attempts to avoid looking at images may have lowered his level of fixation or sexual interest to socially unacceptable groups." Although the Defendant reported having a high sexual attraction to adult females, he "demonstrated significantly higher visual and sexualized fixation to females and males 2 to 5 years old and females 6 to 12 years old than his sexualized interest to adult females." The examiner stated that the Defendant's responses were "associated with an abnormal fixation to female children" and that his "high sexual interest in female children is a concern and should be addressed in treatment." The Defendant also "demonstrated below normal visual fixation responses to females 13 to 17 years-old," and the examiner stated that his response to females in that age group should be assessed further in treatment. The Defendant's VASI results were "associated with a **Moderate-high** level of risk associated with deviant interest" and "suggest[ed] an absence of interest in adult females and higher interest in prepubescent females."

The examiner used two tools to measure the Defendant's risk to reoffend: the STATIC-99R and the STABLE 2007. The Defendant's score on the STATIC-99R placed him in the average risk category, and his score on the STABLE 2007 placed him in the moderate risk category. The examiner concluded that the Defendant's risk to reoffend was average. She recommended that he participate in sex-offender-specific treatment and

- 11 -

stated that his average risk to reoffend suggested he could participate in an outpatient community-based program. The examiner noted that the Defendant's level of honesty and cognitive and verbal skills were factors associated with a good prognosis.

At the conclusion of the proof, the trial court stated that it had considered the evidence at the sentencing hearing; the presentence report; the principles of sentencing and arguments as to sentencing alternatives; the nature and circumstances of the offenses; enhancement and mitigating factors; the Defendant's allocution; and the validated risk and needs assessment in the Strong-R report. The trial court said that it also had considered twenty-one letters of recommendation written on the Defendant's behalf and delivered by defense counsel to the trial court.[3] The trial court said that the letters showed the Defendant was "loved greatly" and "blessed" and that they showed he pursued a master's degree, was a very good student, had no criminal record, and had a good work history until he moved to Gallatin. The trial court noted that after the Defendant was indicted in this case, he made bond and was allowed to move to Michigan. He began attending Celebrate Recovery, established a business and a ministry to feed the homeless, helped people, made friends, and followed all of the rules and restrictions associated with his bond. The trial court stated that the Defendant "[did] all the right things" in Michigan and that he was "very passionate" in his allocution about what he accomplished there. However, the trial court took issue with the Defendant's claim in his allocution "about how much [he'd] suffered already."

The trial court noted that according to the Defendant's presentence report, he abused alcohol, which contributed to his having a one-month affair while he and his second wife were living in Nashville. The trial court also noted that the Defendant pursued and "groomed" the fourteen-year-old victim. The trial court found that enhancement factors (7), that the offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement, and (14), that the defendant abused a position of public or private trust, applied to his convictions. *See* Tenn. Code Ann. § 40-35-114(7), (14). In mitigation, the trial court addressed factor (13), the catchall provision, and noted that the Defendant "has a good family," did not have a criminal record, and "has taken steps to get where he should." Tenn. Code Ann. § 40-35-113(13). However, the trial court then stated, "I don't think that he needs to be rewarded for what he did."

The trial court addressed the nature and circumstances of the offenses and whether confinement was necessary to avoid depreciating the seriousness of the offenses. The trial court stated that violating a child's innocence was "among the greatest evils known to man"; that "[t]hese crimes involved perversion, immorality, paganism"; and that the crimes "were godless because your god was your sexual appetite and your weapon was the internet." The trial court said that it had reviewed the messages and photographs exchanged between the victim and the Defendant and that the Defendant "repeatedly asked

---

[3] Defense counsel did not introduce the letters into evidence as an exhibit, and they are not in the appellate record.

her to have sex with him in his classroom in the closet." The trial court referred to the Defendant as a "predator[]" and stated, "Had it not been for the grace of God and the intervention of [another student], . . . [the crimes] would have been much worse."

The trial court quoted some of the Defendant's messages to the victim. The trial court said that the messages and photographs "frankly [make] me sick" and that the victim "look[ed] like she was being groomed to be a porn star." The trial court noted that the Defendant sent nine photographs of his exposed and erect penis to the victim and that he took a majority of those photographs in Gallatin High School. The trial court recalled that the Defendant also touched the victim in class, including one time when "he came up behind her and she felt his erect penis against her back in class in front of others."

The trial court said it was "concern[ed]" about the Defendant's psychosexual risk assessment and quoted extensively from his version of the offenses, his psychosexual history, and his test results. The trial court then addressed the damage to the victim and stated that the Defendant's actions "completely destroyed her high school years," caused her to be bullied and afraid of men, and "ruined some of the best years of her life." The trial court said that the Defendant's actions also damaged the reputation of teachers in general and the reputation of Gallatin High School. The trial court found that the crimes were "reprehensible, offensive, and to an excessive or exaggerated degree."

Next, the trial court addressed deterrence and found that three of the five factors enumerated in *State v. Hooper*, 29 S.W.3d 1, 10 (Tenn. 2000), supported the need for deterrence in this case. First, the trial court found that other incidents of the charged offenses were increasingly present in the community, stating that "[w]e've had about three cases, maybe more . . . of teachers sexually abusing students in this county." Second, the trial court found that the Defendant's crimes were the result of intentional conduct. Finally, the trial court found that the Defendant's crimes and convictions had received substantial publicity beyond that normally expected in the typical case, noting that reporters from a television station and a newspaper were present at the sentencing hearing and that the case had been publicized locally and in Nashville.

In sum, the trial found that confinement was necessary to avoid depreciating the seriousness of the offenses and that confinement was particularly suited to provide an effective deterrence to others likely to commit similar offenses. The trial court ordered that the Defendant serve his effective sixteen-year sentence in confinement.

## ANALYSIS

On appeal, the Defendant claims that he was denied due process at sentencing because the trial court allowed hearsay testimony, "infused" the court's religious beliefs into the court's sentencing decisions, failed to consider required statistical information from the AOC, and considered information outside the Defendant's actual criminal

conduct. In the alternative, he contends that we should review the trial court's sentencing decisions de novo because the trial court did not follow the purposes and principles of sentencing when the court infused its religious beliefs into its sentencing decisions, ignored statistical information from the AOC, and speculated about his other potential criminal behavior. The Defendant asserts that based on our de novo review, we should resentence him to full probation or split confinement. The State argues that the Defendant has not shown a due process violation and that even under de novo review, he is not entitled to relief. We agree with the State.

## I. Due Process

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 8 of the Tennessee Constitution afford every criminal defendant the right to a fair trial. *See Johnson v. State*, 38 S.W.3d 52, 55 (Tenn. 2001). Cumulative errors at sentencing may warrant a new sentencing hearing even though individual errors do not require relief. *State v. Molly L. Miles*, No. 03C01-9812-CR-00447, 1999 WL 1191535, at *11 (Tenn. Crim. App. Dec. 16, 1999) (citing *State v. Cribbs*, 967 S.W.2d 773, 789 (Tenn. 1998)).

## A. Hearsay

First, the Defendant contends that the trial court erred by allowing Investigator Cook to testify about statements made by the Defendant's former student and the Defendant's ex-wife because the statements were unreliable hearsay. With regard to the former student's statements, the Defendant also claims that he did not have an opportunity to rebut the statements. The State argues that Investigator Cook's testimony about the former student's statements was admissible as reliable hearsay and that the Defendant has waived the issue with regard to his ex-wife's statements because he failed to object at the sentencing hearing. We conclude that the trial court erred by allowing Investigator Cook to testify about the former student's statements but that the error was harmless.

During Investigator Cook's testimony, he stated that at the prosecutor's request, he spoke with S.F., who had been the Defendant's student from 2011 to 2012. Investigator Cook began to testify about what S.F. told him, and defense counsel objected on hearsay grounds. The State argued that the testimony was reliable hearsay. Defense counsel responded that the State had not established that S.F.'s statements were reliable and that the defense was unaware of the statements prior to the hearing. The trial court stated that "Rule 104 applies" and ruled that the statements were reliable because they were part of the officer's investigation. The State resumed questioning Investigator Cook, and he testified about S.F.'s claims that the Defendant pursued her and tried to have a relationship with her. After Investigator Cook testified about S.F.'s statements, he testified about statements made to him by the Defendant's ex-wife. The Defendant did not object to those statements.

- 14 -

Tennessee Rule of Evidence 104(a) provides that "[p]reliminary questions concerning . . . the admissibility of evidence shall be determined by the court" and that "[i]n making its determination the court is not bound by the rules of evidence except those with respect to privileges." Although the trial court referred to Rule 104, the trial court then ruled that Investigator Cook's testimony about S.F.'s statements were reliable because they were part of his investigation. Tennessee Code Annotated section 40-35-209(b) provides that in a sentencing hearing, reliable hearsay is admissible as long as a defendant "is accorded a fair opportunity to rebut any hearsay evidence so admitted." Examples of reliable hearsay include, but are not limited to, certified copies of convictions or documents and presentence reports. *See State v. Baker*, 956 S.W.2d 8, 17 (Tenn. Crim. App. 1997).

Initially, we agree with the State that the Defendant has waived any issue regarding the statements made by his ex-wife because he failed to object to the statements at the sentencing hearing. *See* Tenn. R. Evid. 36(a). As to Investigator Cook's testimony about S.F.'s statements, the State argues that they were reliable hearsay because they were "akin to the sort of evidence routinely admitted in presentence reports or victim impact statements" and because Investigator Cook, who was a trained law enforcement officer, "presumably would be a more reliable source for an accurate interview than a probation officer who prepares a presentence report." The State acknowledges that while the Defendant did not have advance notice of the statements, he is not entitled to relief because he did not request a continuance to investigate S.F.'s allegations.

In *State v. Benjamin S. Huffman, Jr.*, No. M2007-02103-CCA-R3-CD, 2009 WL 1349223, at *9 (Tenn. Crim. App. May 14, 2009), this court addressed a police officer's testifying at sentencing about a "double hearsay" statement. This court said it was "not persuaded" that the statement was untrustworthy or unreliable, noting that the officer learned about the statement while conducting a "thorough investigation" of the accident scene; that the officer heard the statement from an emergency medical technician, who treated the declarant at the scene of the accident; and that the officer documented the statement in his police report. *Benjamin S. Huffman, Jr.*, 2009 WL 1349223, at *9.

Here, Investigator Cook's involvement in the case was not part of the GPD's formal investigation of the crimes. Instead, his investigation occurred more than a year after the indictment and at the prosecutor's request apparently to investigate other possible victims for purposes of sentencing. Investigator Cook did not offer any testimony about the circumstances in which he questioned S.F., other than he spoke with her on the telephone, and the record does not demonstrate that S.F. even knew she was speaking with a police officer. Investigator Cook talked with S.F. approximately ten years after the Defendant was her teacher, and the Defendant had no opportunity to rebut her statements at the sentencing hearing. Therefore, we conclude that neither condition of Tennessee Code Annotated section 40-35-209(b) was met and that the trial court erred by allowing Investigator Cook to testify about S.F.'s statements.

The State argues that any error was harmless beyond a reasonable doubt because the trial court stated during its pronouncement of the Defendant's sentence that it was not "going to hold" Investigator Cook's testimony about S.F.'s statements against the Defendant. Our review of the sentencing hearing transcript shows that the trial court actually stated as follows:

> [T]he more I hear about [the Defendant], this was an attitude that developed over a period of time. I heard what [S.F.] told Investigator Cook, and that's something that I've kind of wondered about and that was not addressed by the defendant in his allocution statement.
>
> I'm not going to hold that against you, Mr. Richmond, but it just goes with my thoughts that this attitude that you developed didn't just happen, and we'll go into that in just a minute.

We think the trial court's comments demonstrate that it considered S.F.'s statements but that it gave the statements little, if any, probative value. Therefore, we agree with the State that the trial court's error was harmless.

## B. Religious Beliefs

Next, the Defendant contends that the trial court erred by infusing its religious beliefs into its decision to deny his request for alternative sentencing. Again, we conclude that the trial court erred but that the error was harmless.

During Mr. Fuller's testimony, he stated that he thought the Defendant had "an encounter with God" in jail and that "I know people will shake their heads in here. I know people will disagree with that and that's okay." The trial court responded, "I don't. I don't shake my head and disagree." Mr. Fuller's testimony about religion continued, and the trial court interjected several of its own religious comments. For example, Mr. Fuller stated, "Scripture talks about when somebody comes to Jesus, when they have a spiritual encounter with Jesus Christ, the old part is taken out. The heart -- ." The trial court interrupted and said, "A new creature; old things have passed." Later, the following colloquy occurred:

> [THE WITNESS:] So as you referenced, Your Honor, the Bible speaks about a new creation and a new man and I firmly believe that in the epitome of darkness, the pain and suffering of [the Defendant's] life, that he had that encounter. I do believe that his heart has genuinely been transformed.
>
> I work with people all day long in ministry. I work in recovery.

THE COURT: Are you saying that he should be treated different than anybody else?

THE WITNESS: I'm not saying that.

THE COURT: Okay.

THE WITNESS: I'm just telling you what I saw, yeah.

So -- and I will, you know, testify that I do believe he's not the same person.

And to answer your question, Your Honor, this doesn't excuse anything that he's done. This doesn't excuse his past. It doesn't excuse his actions. It doesn't excuse him or justify anything that he has done. But from a spiritual standpoint, we know that mercy triumphs justice, that mercy triumphs judgment. So my -

. . . .

THE COURT: And so you're saying mercy triumphs that in a rule -- in a court of law?

THE WITNESS: I was saying from a spiritual standpoint, from a scriptural standpoint.

THE COURT: Okay. Do you understand this is not a church? This is the government. There are three institutions that God has ordained for man: the family, the church, and government. All three are separate. Church is separate from government. Jesus said, Render to Caesar the things that are Caesar's, and to God the things that are God's. Look at Romans 13:1. Now, you may proceed.

During the Defendant's allocution, he briefly apologized to the victim's family. He then spent a considerable amount of time explaining his past accomplishments, describing his religious conversion after his arrest, and asserting why justice already had been served in this case. The Defendant also addressed the trial court's own religious beliefs, stating,

… I'm a man of God and a man whose life is forever changed by God and that I trust you. Every case I read -- I read every single case on the kiosk when I was locked up about you. In every case -- and God revealed to me that I can trust your decision, whatever it is, and I'll be okay because God will be with me. You have shown so much integrity and trust throughout the

- 17 -

years that I know -- I know that the same God you talk about is the same God I talk about. I can feel it. I know it. And even though sometimes we want to deny this fact, godly -- truly godly men cannot define this fact -- we cannot deny it and who he is.

During the announcement of its sentencing decision, the trial court made multiple references to religion. For example, the trial court said that "justice must be firmly grounded upon moral standards of right and wrong that flow out from God's character." The trial court also said that "God demands forgiveness" but that [j]ustice is the operation of the government." Later, the trial court said, "These crimes involved perversion, immorality, paganism. They were godless because your god was your sexual appetite and your weapon was the internet." The trial court went on to say that "the grace of God" prevented the crimes from being much worse and that the Defendant's messages to the victim exemplified "godlessness and perversion."

The State argues that the trial court's religious comments were responses to Mr. Fuller's testimony and the Defendant's allocution. At oral arguments, defense counsel acknowledged that some of the trial court's comments were responsive to Mr. Fuller's testimony. However, defense counsel asserted that the trial court's remaining comments were improper because trial courts are prohibited from infusing religious beliefs into sentencing decisions.

Tennessee Code Annotated section 40-35-102(4) provides that "[s]entencing should exclude all considerations respecting . . . religion of the . . . individual." Our supreme court has held that "[r]eference to religious law during a criminal trial has been disapproved in this State, and trial court judges should therefore refrain from any discussion on religious law." *State v. Stephenson*, 878 S.W.2d 530, 541 (Tenn. 1994), *abrogated on other grounds by State v. Saylor*, 117 S.W.3d 239, 246 (Tenn. 2003).

This court previously has advised this same trial court to refrain from making religious remarks during sentencing. *See State v. Timothy B. Lenarduzzi*, No. M2012-01236-CCA-R3-CD, 2013 WL 436443, at *8 (Tenn. Crim. App. Feb. 5, 2013). Moreover, we agree with the Defendant that the trial court's religious comments in this case were improper. After the trial court made its comments, though, the trial court stated that the judge's role was "to evaluate and judge cases fairly according to an established standard of law" and that the trial court was "going to rule today, according to what the facts are and the rule of law, nothing else." The trial court also stated that sentencing should exclude all considerations about religion, including "Christians and non-Christians and any religion under the sky." The trial court then gave a lengthy, well-reasoned explanation for ordering confinement based on the circumstances of the offenses and deterrence. Therefore, we conclude that Defendant is not entitled to relief on this issue.

## C.  Statistical Information

The Defendant claims that the trial court erred by failing to consider the statistical information provided by the AOC in its sentencing decision.  The State argues that we should consider the issue waived because the Defendant should have asked to provide the information to the trial court as a late-filed exhibit and that, in any event, the trial court's failure to consider the statistical information was a "minor" error that does not require reversal of the sentence.  Again, we conclude that the trial court erred, but that the Defendant is not entitled to relief.

At the conclusion of the proof, the trial court stated that it had considered seven of the eight factors listed in Tennessee Code Annotated section 40-35-210(b).  However, the trial court said that it was unable to consider the remaining factor, statistical information provided by the AOC as to sentencing practices for similar offenses in Tennessee, explaining,

> I've tried to get on that website and I can't do it.  I can't get on it, and I'm sorry.  But the Court has reservations about looking at statistics about sentencing practices for similar cases.  Every case is different.  There is not a case anywhere that's anything like this, and trial judges do not want to be robots.

Tennessee Code Annotated section 40-35-210(b) lists eight factors that the trial court "shall" consider to determine the specific length of the sentence and "the appropriate combination of sentencing alternatives."  One of those factors is "[a]ny statistical information provided by the [AOC] as to sentencing practices for similar offenses in Tennessee." Tenn. Code Ann. § 40-35-210(b)(6).  Therefore, the trial court had a statutory duty to consider the statistical information and erred by failing to do so.

When the trial court fails to make the requisite findings, this court can either conduct a de novo review or remand the case to the trial court to consider the requite factors.  *State v. Pollard*, 432 S.W.3d 851, 864 (Tenn. 2013).  We think that de novo review is appropriate in this case and that the trial court's error does not necessitate reversal of the trial court's sentencing decision.  We will address de novo review below.

## D.  Additional Criminal Conduct

Finally, the Defendant contends that the trial court erred by considering information beyond his actual criminal conduct because the trial court "spent considerable energy speculating about what could have happened if various parties had not intervened."  In support of his argument, the Defendant notes that the trial court repeatedly referred to the Defendant's requests for the victim to meet him in the closet and that the trial court stated,

"Had it not been for the grace of God and the intervention of [another student], . . . [the crimes] would have been much worse."

We disagree with the Defendant's claim that the trial court was speculating about what could have happened in the closet. The trial court made its comments about the closet during its consideration of the nature and circumstances of the offenses, and the record is replete with evidence that the Defendant wanted the victim to meet him in the closet for sex. According to the State's recitation of facts at the guilty plea hearing, the Defendant often asked the victim to meet him in his closet to engage in sexual activity, and he pressured her for more nude photographs to "repay" him when she failed to meet him. Investigator Hope testified, without any objection from the defense, that the Defendant kept asking the victim to have sex with him in the closet and that Investigator Hope "absolutely" thought the Defendant would have had sex with the victim if the victim had "showed up." The Defendant himself stated in the psychosexual risk assessment that he wanted "alone time" with the victim in the closet so that she could give him a "blow job." Our review of the Kik messages shows that the Defendant repeatedly asked the victim to meet him in the "back room" for sex. Therefore, the trial court did not err by considering the evidence as part of the nature and circumstances of the offenses.

To summarize, we have concluded that the trial court erred by allowing hearsay testimony, by making religious references during sentencing, and by not considering statistical information from the AOC  However, the trial court's ruling spans more than forty-six pages in which the court thoroughly considered and analyzed almost all of the factors relevant to alternative sentencing. The trial court carefully explained why confinement was necessary to avoid depreciating the seriousness of the offenses and why confinement was particularly suited to provide an effective deterrence to others likely to commit similar offenses. Therefore, we do not think the errors, individually or cumulatively, deprived the Defendant of due process. However, we conclude that the errors warrant de novo review of the trial court's sentencing decisions.

## II.  Denial of Alternative Sentencing

The Defendant contends that upon de novo review, we should order that he serve his effective sixteen-year sentence as full probation or split confinement. The State argues that the record supports the trial court's denial of alternative sentencing. We agree with the State.

Ordinarily, this court reviews the length, range, and manner of service of a sentence imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012); *see State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012) (applying the *Bise* standard to alternative sentencing). In determining the defendant's sentence, the trial court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence

- 20 -

report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the defendant in his own behalf; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. *See* Tenn. Code Ann. § 40-35-210(b); *see also Bise*, 380 S.W.3d at 697-98. The trial court also must consider the potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. § 40-35-103(5). The burden is on the Defendant to demonstrate the impropriety of his sentence. *See* Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts.

Regarding alternative sentencing for a felony, a defendant is eligible for alternative sentencing if the sentence actually imposed is ten years or less. *See* Tenn. Code Ann. § 40-35-303(a). Moreover, a defendant who is an especially mitigated or standard offender convicted of a Class C, D, or E felony should be considered a favorable candidate for alternative sentencing absent evidence to the contrary. *See* Tenn. Code Ann. § 40-35-102(6). In determining if incarceration is appropriate in a given case, a trial court should consider whether:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1). A defendant with a long history of criminal conduct and "evincing failure of past efforts at rehabilitation" is presumed unsuitable for alternative sentencing. Tenn. Code Ann. § 40-35-102(5).

We have considered the aforementioned factors, including the statistical information provided by the AOC, as well as the purposes and principles of sentencing. The trial court did not take judicial notice of the statistical information provided by the AOC. This court is taking judicial notice of and is considering the statistical information provided by the AOC.

First, as defense counsel correctly noted at sentencing, the Defendant's eight convictions are Class B felonies. *See* Tenn. Code Ann. § 39-13-529(e)(1). Therefore, he is not considered to be a favorable candidate for alternative sentencing. As to the statistical

information provided by the AOC, the Defendant's sentencing hearing occurred in July 2021. In March 2021, the AOC published a statistical report of sentencing for defendants sentenced between July 1, 2012, and June 30, 2020. According to that report, from 2019 to 2020, 50.5% of defendants convicted of Class B felonies were sentenced to incarceration. The report also shows that the average incarceration length for defendants convicted of Class B felonies was 110.50 months or 9.20 years and that the median incarceration length was 96.00 months or eight years. In this case, the Defendant was sentenced to eight years of incarceration for each of his convictions, which was less than the average and the same as the median. Thus, his sentences are not out of line with sentences imposed in other cases.

Additionally, we agree with the trial court that confinement is necessary to avoid depreciating the seriousness of the offenses. The recitation of the facts at the guilty plea hearing, the testimony at the sentencing hearing, the versions of the facts presented in the presentence report and the psychosexual risk assessment, and our review of the Kik messages and photographs introduced into evidence confirm the serious nature of these crimes. The Defendant was the victim's high school teacher. His messages show that he pursued her, that he groomed her, and that he constantly pressured her to send him nude photographs of herself. He instructed her on how to pose in sexually explicit positions for him, and he repeatedly tried to get her to meet him in his classroom closet for sex. Many of the Defendant's messages about what he wanted to do to the victim sexually are too explicit and vulgar to quote in this opinion. When the victim made excuses as to why she could not meet the Defendant, he demanded more nude photographs of her as "repayment." He sent her photographs of his exposed and erect penis to her, and he even sent her a video of himself masturbating. The video and most of the photographs were made at school. The Defendant also put his erect penis against the victim's back while other students were present. Like the trial court, we think the crimes were "reprehensible, offensive, and to or otherwise of an excessive or exaggerated degree." *State v. Trotter*, 201 S.W.3d 651, 654 (Tenn. 2006). Accordingly, we conclude that the trial court did not err by denying alternative sentencing.

## CONCLUSION

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

_____
JOHN W. CAMPBELL, SR., JUDGE